1  Kerry R. Bensinger, State Bar No. 132178
2  BENSINGER, RITT, TAI & THVEDT
   A Limited Liability Partnership
   65 North Raymond Avenue, Suite 320
3  Pasadena, California  91103
   Tel:   (626) 685-2550
4  Fax:   (626) 685-2562

5  Attorney for Defendant ALEXANDER SANCHEZ

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11  UNITED STATES OF AMERICA,          **Case No. CR-09 00466-R-22**

12                                      **DEFENDANTS' NOTICE OF**
                Plaintiff,              **MOTION AND MOTION TO**
13                                      **SUPPRESS WIRETAP EVIDENCE**
                                        **RESULTING FROM UNLAWFUL**
14      v.                              **DELEGATION OF WARRANT**
                                        **EXECUTION TO NON LAW**
15  JOSE ALFARO, et al.,                **ENFORCEMENT, UNTRAINED,**
                                        **UNSUPERVISED CIVILIANS FOR**
16              Defendants.             **HIRE**

17                                      Hearing Date:    August 30, 2010
                                        Time:            1:30 p.m.
18                                      Courtroom:       Judge Manuel L. Real

19

20

21  **TO UNITED STATES ATTORNEY ANDRE BIROTTE AND ASSISTANT**

22  **UNITED STATES ATTORNEYS ELIZABETH CARPENTER, ABIGAIL W.**

23  **EVANS, AND XOCHITL ARTEGA, ALL PARTIES AND THEIR**

24  **ATTORNEYS OF RECORD:**

25      **PLEASE TAKE NOTICE** that on August 30, 2010, at 1:30 p.m., or as soon

26  thereafter as counsel may be heard, in the courtroom of the Honorable Manuel L.

27  Real, defendant Alex Sanchez, by and through his counsel of record Kerry R.

28  Bensinger, joined in by defendants Jose Alfaro, Hugo Bolanos, Juan Cendejas, Carlos

1  Cuentas, Yanira Escalante, Juan Fuentes, Jose Gonzalez, Paul Cortez Jovel, Pedro
2  Lopez, Juan Mancilla, Josue Martinez, Kelvin Melgar, Fernando Morales, David
3  Rivera and Guillermo Vasquez-Landaver, will and hereby do move to suppress any
4  and all evidence seized or gathered, directly or indirectly, as a result of unlawful
5  electronic eavesdropping and surveillance.

6      This motion is made on the grounds that the wiretap orders 00-119, 00-119(A),
7  00-119(B), 03-336, 03-354, 06-104, 06-118, 06-194, 06-285, 06-285(A), 06-285(B),
8  08wt001-1, 08wt001-2, 08wt001-3, 08wt0012-1, 08wt001-4, and 08wt012-2 are
9  invalid on their face in that the execution thereof was delegated to private civilian
10  contractors without any law enforcement training or qualifications in the absence of
11  any compelling reason therefor.  Furthermore, the evidence was unlawfully
12  intercepted because it was collected by untrained, unqualified, inadequately
13  supervised non-law enforcement personnel offering their search and seizure services
14  for hire.

15      This motion is based upon the attached Memorandum of Points and
16  Authorities, Declaration of Kerry Bensinger filed in support of Motion to Suppress
17  Evidence Served from Unnecessary Wiretap Obtained on False Pretenses, exhibits, all
18  files and records in this case, and any further evidence as may be adduced at the
19  hearing on this motion.

20

21  DATED:  July 30, 2010                Respectfully submitted,

22                                       BENSINGER, RITT, TAI & THVEDT
                                         A Limited Liability Law Partnership
23

24                                            S/ KERRY R. BENSINGER

25                                       KERRY R. BENSINGER
                                         Attorney for Defendant
26                                       ALEXANDER SANCHEZ

27

28

2

1              **MEMORANDUM OF POINTS AND AUTHORITIES**

2

3                              **I.**

4                     **INTRODUCTION**

5        The government seized tens of thousands of telephone conversations by and

6 between the defendants and others through a series of 21 separate wiretaps obtained

7 over the course of nine years.  The government delegated the task of conducting the

8 searches to non law enforcement civilians in 17 of those 21 wiretaps.[1]  Defendants

9 hereby move to suppress the evidence gathered through those wiretaps as the product

10 of an illegal search and seizure and as not having been conducted in accordance with

11 the order authorizing interception.

12

13                             **II.**

14              **STATEMENT OF FACTS**

15        On May 25, 2000, the government sought the first in a series of wiretaps in this

16 case.  The government sought to listen in to every conversation that defendant Ruben

17 Pineda and non-parties Ricardo Hernandez, Mario Osorio, and Reynaldo Mejia had

18 with each other or with any other person any of them conversed with using Pineda's

19 home telephone as well as "any background conversation intercepted while the

20 instrument is off the hook or otherwise in use."  Ex. 1, at 53, Bates 538.

21        The government sought wiretapping authorization because it anticipated that

22 some of the conversations might relate to "the acquisition and distribution of . . .

23 heroin," Ex. 1, at 7, 52, Bates 525, 537.  However, law enforcement also recognized

24 that others besides these four individuals (such as, predictably, other members of

25 Pineda's family or others living with him) would have access to, and use, the

26

27     [1]  Wiretap orders 00-119, 00-119(A), 00-119(B), 03-336, 03-354, 06-104, 06-
28 118, 06-194, 06-285, 06-285(A), 06-285(B), 08wt001-1, 08wt001-2, 08wt001-3, 08wt0012-1, 08wt001-4, and 08wt012-2.

telephone in Pineda's home. The government also recognized that everyone who had access to the telephone in Pineda's home would likely use the telephone for personal conversations and communications that were "not otherwise subject to interception under Chapter 119 of Title 18 of the United States Code," including, in particular, conversations that were entitled to a claim of privilege. Ex. 1 at 54, Bates 539.

Nonetheless, under the putative authority of 18 U.S.C. § 2518(5), the government asked for, and the issuing court granted, permission for the task of intercepting, listening to, and selecting conversations for seizure to be conducted not only by law enforcement agents, but to be delegated to "individuals operating under a contract with the government and acting under the supervision of [law enforcement]." *E.g.* Ex. 1, at 49-50 (00-119), Bates 537-38. The applications did not suggest, and the orders did not require, any need for delegation of the search and seizure task to civilian contractors, the nature of any conditions that would prompt, trigger or justify such a delegation, any minimum standards of training or qualifications for any contractors employed, any showing that the government demonstrate the need for special skills not possessed by law enforcement or any other showing of need before delegating tasks to the civilian contractors, or any specification of the nature or type of supervision to be provided to the civilians to whom were delegated the tasks of searching and seizing the otherwise private conversations.[2]

_____

[2] Similar provisions were contained in most of the other wiretap orders used to gather evidence in this case. *See* Ex. 2, at 115 (00-119(A)), Bates 440; Ex. 3, at 181 (00-119(B)), Bates 421; Ex. 8 (03-336), at 645; Bates 6708; Ex. 9 (03-354), at 730, Bates 14,976; Ex. 10 (06-104), at 852, Bates 006; Ex. 11 (06-118), at 982, Bates 133; Ex. 12 (06-194), at 1075 and 1081, Bates 266, 272; Ex. 13 (06-285), at 1204 and 1209, Bates 776, 781; Ex. 14 (06-285(A)), at 1332, Bates 906, 912; Ex. 15 (06-285(B)), at 1471-1472, Bates 1040-41, 1047; Ex. 16 (08wt001-1), at 1572, Bates US 372; Ex. 17 (08wt001-2), at 1701, Bates US790; Ex. 18 (08wt001-3), at 1827, Bates US1039; Ex. 19 (08wt0012-1), at 1973, Bates US1184; Ex. 20 (08wt001-4), at 2101, Bates US1311; Ex. 21 (08wt012-2), at 2237, Bates US1446.

Of the 21 separate wiretap applications filed in court, only four did not seek and receive permission to delegate the sensitive task of conducting the search and seizure to private civilian contractors. Ex. 4-7 (00-304, 00-304(A), 00-304(B), and 03-194)

## III.

## ARGUMENT

"Though physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed, its broader spirit now shields private speech from unreasonable surveillance." United States v. United States Dist. Court, 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). The Fourth Amendment regulates "not only the seizure of tangible items, but extends as well to the recording of oral statements." Id., *quoting* Katz v. United States, 389 U.S. 347, 353, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The Court has reasoned that "the broad and unsuspected governmental incursions into conversational privacy which electronic surveillance entails necessitate the application of Fourth Amendment safeguards." United States v. United States Dist. Court, 407 U.S. at 313 (footnote omitted).

Even outside the context of wiretaps, "[t]he proceeding by search warrant is a drastic one and must be carefully circumscribed so as to prevent unauthorized invasions of the sanctity of a man's home and the privacies of life." Berger v. New York, 388 U.S. 41, 58, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967) (internal quotations omitted). When it comes to wiretapping, however, "drastic" is an understatement. "Few threats to liberty exist which are greater than that posed by the use of eavesdropping devices." Berger, 388 U.S. at 63. When drafting the initial wiretap act, Congress was keenly aware that, with a wiretapping device installed, "Every spoken word relating to each man's personal, marital, religious, political, or commercial concerns can be intercepted by an unseen auditor and turned against the speaker." S. REP. NO. 90-1097, at 38 (Apr. 29, 1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2154.

The Fourth Amendment's prohibition of unreasonable searches and seizures extends not only to the initiation of searches but also to the manner in which searches are conducted. United States v. Ramirez, 523 U.S. 65, 71, 118 S.Ct. 992, 140 L.Ed.2d 191 (1998) ("The general touchstone of reasonableness which governs Fourth

3

1  Amendment analysis governs the method of execution of the warrant.") (citation

2  omitted); <u>Dalia v. United States</u>, 441 U.S. 238, 257, 99 S.Ct. 1682, 60 L.Ed.2d 177

3  (1979) ("it is generally left to the discretion of the executing officers to determine the

4  details of how best to proceed with the performance of a search authorized by warrant

5  *– subject of course to the general Fourth Amendment protection 'against*

6  *unreasonable searches and seizures.'"*) (footnote omitted; emphasis added).

7  **A.   The Wiretap Orders Are Facially Defective in Authorizing Law**

8  **Enforcement to Delegate the Essential Law Enforcement Function of**

9  **Executing the Search Warrant to Contractors Conducting the Search for**

10  **Personal Gain and in the Absence of Any Compelling Reason Why the**

11  **Search Could Not Be Executed by Law Enforcement Personnel**

12  "In executing a search warrant, government officials must ensure that the

13  search is conducted in a way that minimizes unwarranted intrusions into an

14  individual's privacy." <u>United States v. Sparks</u>, 265 F.3d 825, 831 (9th Cir. 2001),

15  *overruled on other grounds*, <u>United States v. Grisel</u>, 488 F.3d 844 (9th Cir. 2007).

16  The Ninth Circuit has set forth a three-pronged test to determine the circumstances in

17  which civilian participation in a search does not render a search and seizure

18  unreasonable under the Fourth Amendment:

19  First, the civilian's role must be to aid the efforts of the
   police. In other words, civilians cannot be present simply to

20  further their own goals. <u>Wilson v. Layne</u>, 526 U.S. 603,
   613-14, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (inviting

21  media to 'ride along' on execution of warrant violates the
   defendant's Fourth Amendment rights). Second, the officer

22  must be in need of assistance. Police cannot invite civilians
   to perform searches on a whim; there must be some reason

23  why a law enforcement officer cannot himself conduct the
   search and some reason to believe that postponing the

24  search until an officer is available might raise a safety risk.
   Third, the civilians must be limited to doing what the police

25  had authority to do.

26  <u>Sparks</u>, 265 F.3d at 831-32.

27  Here, the wholesale delegation of authority to civilian contractors fails both the

28  first and the second prong. As best as appears from the discovery, the civilian

4

1  contractors had no reason to participate in the search other than that they were hired

2  to do so. This incentive of personal remuneration by itself calls into question the

3  independence and neutrality of the private monitors, who had an incentive to err on

4  the side of seizure over privacy since the failure to seize conversations would

5  inevitably lead to the termination of the wiretap and, therefore, the termination of

6  their contract project. *Cf.* Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749

7  (1927).

8       Even professional "prosecutors and policemen simply cannot be asked to

9  maintain the requisite neutrality with regard to their own investigations – the

10  'competitive enterprise' that must rightly engage their single-minded attention."

11  Coolidge v. New Hampshire, 403 U.S. 443, 450, 91 S.Ct. 2022, 29 L.Ed.2d 564

12  (1971). It is all the more improbable to civilian individuals who have not sworn to

13  uphold the law or duly and faithfully execute them can be expected to approach the

14  execution of a search warrant with the same degree of professionalism as a trained

15  officer or law enforcement agent.

16       Second, there is no suggestion that the FBI or DEA were "in need of

17  assistance." From all that appears from the discovery, there was *no* reason why the

18  law enforcement officers could not themselves perform the searches. There is no

19  reason to believe that law enforcement personnel were not available to conduct the

20  electronic searches and seizures nor any reason why the seizures could not be

21  postponed until a law enforcement officer was available. There is no suggestion that

22  "safety risk" inspired delegation of the search to persons other than professional law

23  enforcement personnel.

24       The task of intercepting telephone conversations – no different than the

25  execution of a traditional search warrant – implicates significant, important privacy

26  concerns calling for matters of professional law enforcement judgment, not just the

27  gut reaction of a hired civilian contractor.

28

5

1   Once an issuing judge has granted permission for law enforcement to undertake
2   the highly intrusive activity to eavesdropping on private telephonic conversations,
3   only the monitors charged with carrying out the order can ensure protection of Title
4   III's equally important purpose of "protecting the privacy of wire and oral
5   communications," S. Rep. No. 90-1097, at 38,[3] by following the strict minimization
6   requirements of 18 U.S.C. § 2518. Only the monitors executing the order can
7   effectively protect privacy by deciding when *not* to listen to or record conversations
8   that appear to go beyond the scope of the investigation. Notably, unlike all the other
9   safeguards contained in Title III, the requirement that intercepting officers limit the
10  scope of seizures is the only safeguard that operates after the wiretap order has been
11  issued.

12  The risk of "indiscriminate use of [eavesdropping by] law enforcement raises
13  grave constitutional questions under the Fourth and Fifth Amendments and imposes a
14  heavier responsibility on this Court in its supervision of the fairness of procedures."
15  Berger, 388 U.S. at 56. In short, the monitors' decision to minimize – or not to
16  minimize – interception of a particular conversation is the bulwark protection that
17  there be "no greater invasion of privacy . . . than was necessary under the
18  circumstances." Berger, 388 U.S. at 57.[4]

19
20
21

22  [3] *See also* S. REP. NO. 90-1097, at 46, *reprinted in* 1968 U.S.C.C.A.N. 2162
    (under Berger, "Limitations on the officer executing the eavesdrop order which
23  would [] prevent his searching unauthorized areas" are essential to constitutionality of
    eavesdropping).

24
25  [4] Because Congress's legislative power "may not be exercised in a way that
    violates other specific provisions of the Constitution." Saenz v. Roe, 526 U.S. 489,
    508, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999), the statutory grant of permission to
26  delegate wiretap searches to private contractors nonetheless violates the Fourth
    Amendment's protection against searches that are carried out in an unreasonable
27  manner. Lacking any justification for enlisting private civilian contractors to perform
    what is an essentially law enforcement function that law enforcement is fully capable
28  of performing, the wiretap orders violated the constitution.

6

**B.** **To The Extent the Seizures Were Delegated to Private Civilian Contractors without a Compelling Reason therefor, The Communications Seized Under the Wiretap Orders Were Unlawfully Intercepted**

The Government has produced no evidence tending to establish that civilian contractors were subject to any degree of supervision by law enforcement in executing the wiretap warrants.  While "Section 2518(5) does not require the government to follow any specific protocol to properly supervise a wiretap," United States v. Reed, 575 F.3d 900, 918 (9th Cir. 2009), here, there is no indication that the government provided any supervision whatsoever.  In the event the court does not suppress the evidence collected through the wiretaps on the ground that the warrants were defective on their face, the defendants seek an evidentiary hearing at which to present evidence that the seizures were executed in a manner inconsistent with the Fourth Amendment.

**IV.**

**CONCLUSION**

For all the foregoing reasons, the motion should be granted.

DATED: July 30, 2010                    Respectfully submitted,

                                        BENSINGER, RITT, TAI & THVEDT
                                        A Limited Liability Law Partnership

                                        S/ KERRY R. BENSINGER

                                        KERRY R. BENSINGER
                                        Attorney for Defendant
                                        ALEXANDER SANCHEZ

7